## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**TAMMIE L. TERRELL,**                                        Case No.:

    **Plaintiff,**

**v.**

**ROBERT WILKIE, Secretary,**
**DEPARTMENT OF VETERANS AFFAIRS,**

    **Defendant.**

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL
## INJUNCTIVE RELIEF REQUESTED

Plaintiff, Tammie Terrell, complains of Defendant, Robert Wilkie, Secretary, Department of Veterans Affairs as follows:

1.     This court has jurisdiction pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, including 42 U.S.C. § 2000e-16 and 42 U.S.C. § -2000e-2(m).

2.     Plaintiff has complied with all jurisdictional prerequisites to action under Title VII of the Civil Rights Act of 1964 as amended including having exhausted her administrative remedies.

3.     James A. Haley VA Hospital (Haley VAHCS) is a Veterans Administration (VA) hospital and medical center with related services.  It is located in Tampa, Hillsborough County, Florida.  It is broken down into various services, including the Nursing Service.  The Plaintiff, Tammie L. Terrell is a veteran, an officer.  She is African-American. Plaintiff has worked for the Department of Veteran Affairs at the James A. Haley VAHCS since 1998. She became a nurse manager in the Haley Cove Community Living Center (HCCLC) in 2010. She became manager of key components of the HCCLC under Dr. Inez Joseph and was groomed for Dr.

Joseph's position when Dr. Joseph retired. She is a nurse manager of Whole Health Care since April, 2019 in ambulatory care.

4.      At times material to this complaint, Laureen Doloresco (Doloresco) (Caucasian) was the Chief Nurse Executive over nursing. She is the Associate Director Patient Nursing Care and Services. She has overall managerial control of the service and strong influence over its operations.  She was the Plaintiff's second line supervisor for all material times.  Cheryl Stephen-Rameau (Rameau) was a Chief Nurse and was the first line supervisor of the Plaintiff for material times.  David VanMeter was the Associate Director at material times.  He has also served as acting Deputy Director and now is Deputy Director.

5.      Each of the employees of the VA as described herein were employed by the Defendant and were acting within the course of his or her employment with the Defendant at the time of conduct described herein.  Each of the employees was there during the relevant times of this complaint.

6.      The Plaintiff has engaged in EEO activity. At a time before the Plaintiff filed her informal complaint on September 22, 2015 based upon her good faith belief that she had been discriminated against based on her national origin and race and others had been discriminated based upon disability as evidenced in the claim identified below she complained to supervisors, including service chief's Lucille Raia, and Zahira Sanabria and refused to take what she believed was discriminating actions against Dr. Carol Rueter. Raia, Sanabria and Doloresco knew of her actions. She identified the RMOs as, Doloresco, (national origin: Caucasian: race: Caucasian) and Rameau, (national origin: Caribbean descent; Guyana; and race: Black).  She also complained about discrimination to her supervisor.  Besides that, the Plaintiff went to see Sylvia Jordan to whom she also complained about discrimination.  Plaintiff did not at that time

file a formal complaint of discrimination, for she, as well as a colleague who did not file either, were worried about their careers, and they did not want to be blackballed.  The Plaintiff filed her informal complaint on September 22, 2015.  She filed her formal complaint on December 31, 2015.  She requested amended complaints on March 24, 2016 and April 7, 2016. Her original formal complaint was accepted for investigation on February 23, 2016 and her amended complaints were accepted on March 29, 2016 and April 12, 2016.  Since then, she has fully participated in this case through full participation in the administrative process, including pleadings, discovery, and depositions.  More than 360 days have passed since she filed her formal complaint and the filing of her amended complaint on March 29, 2016, and a second amendment on April 12, 2016 thus satisfying the jurisdictional requirements of 42 U.S.C. § 2000e-16(c).

## GENERAL ALLEGATIONS

### Race, African American, Color Black, Gender (Female), Reprisal for Protected EEO Activity, and Hostile Work Environment Harassment

7.    Plaintiff is an African-American veteran who worked in the Haley Cove Community Living Center (HCCLC) for many years. She worked under the long term Chief Nurse of the HCCLC, Dr. Inez Joseph throughout that time. She became the manager of key components of the HCCLC and Dr. Joseph groomed her for Dr. Joseph's position when Dr. Joseph retired. She was highly rated, and highly thought of by both the nurses within that area as well as physicians. When Dr. Joseph retired, Plaintiff ran the HCCLC and assumed the responsibilities of the HCCLC Chief Nurse for nearly a year. She was not credited by Doloresco with that experience because Doloresco titularly assigned Zahira Sanabria as the Acting Chief. However, Sanabria seldom came to the HCCLC and left all responsibilities to Plaintiff, who performed them.

3

8.      After Dr. Joseph retired, Plaintiff applied for the position as Chief Nurse of the HCCLC. The selection process had three different stages. At each stage, Plaintiff was the panel's highest rated applicant. After the first interview process, Plaintiff was rated the highest applicant, but Doloresco was the selecting official and she has a history of discrimination against certain minorities, African-Americans and Asians, in the selection of management positions. After the first stage, Doloresco chose a white applicant for the position from outside the facility. Ultimately, the white applicant decided against taking the position. Instead of going to the Plaintiff, who had been groomed for the position and was the most highly rated applicant, Doloresco had a second interview process set up in which more people were interviewed. Once again, Plaintiff was the most highly rated person. Everyone on the panel either highly recommended or endorsed Plaintiff for the position. Doloresco refused to hire her. She set up a third panel. This panel consisted of several different people from the first two panels. The change in panels was significant in that the third panel did not include any African-Americans while the first panel included one. It also did not include two people that had scored Plaintiff highly. Those people dealt closely with the HCCLC, but they did not report to Doloresco through their chain of command. The third panel consisted of two of the members of the first and second panels, and one person that was not on either of those panels. That person (Sanabria) reported directly to Doloresco. Sanabria also had conflicts with the Plaintiff. The selectee, Cheryl Stephen-Rameau, a black from outside the USA, was told to apply. The scoring contained in the Report of Investigation (ROI) inaccurately shows that the selectee scored higher than the Plaintiff.  Facts developed in discovery showed that the Plaintiff actually had the highest score. Moreover, the selectee's resume or application was never even scored. That was inconsistent with all other applicants, but consistent with the fact that Doloresco wanted

4

Rameau to apply. Doloresco's statement in the ROI claims she selected the candidate endorsed by the panel. Following the third panel, there is an email from one of the direct reports to Doloresco, Burcham, stating that the panel endorsed the selectee. That is not true and Doloresco knew it. Dr. Inna Sheyner, a physician in charge of the medicine side of the HCCLC Clinic, who was on all three panels and as a physician did not report to Doloresco, maintains that she always supported Plaintiff for the position. In fact, Plaintiff is the only person she highly recommended for the position after each panel. She testified that she personally told that to Doloresco after the third interview panel. After the first and second panel, everyone either highly recommended or endorsed the Plaintiff but she was not selected.

9.    Moreover, a confidant of Doloresco, Raia, told another employee before the second round of selections that the Plaintiff was "unqualified" for the position. This could not have been on any legitimate basis because she had the most experience for the position, was certified for it and had the highest scores after each panel.

10.    In a patently prejudicial process and despite being the highest rated person, the Plaintiff never did get the position.

11.    The Plaintiff has also been put through a hostile work environment by Doloresco, Sanabria and the selectee (Rameau). The allegations below reflect she has been discriminated against on the basis of national origin and race and retaliated against.

## SPECIFIC ALLEGATIONS

12.    Plaintiff was a senior manager under the longtime Chief Nurse of HCCLC, Dr. Inez Joseph. Dr. Joseph had groomed Plaintiff for her position. When Dr. Joseph stepped down, Plaintiff took over the primary responsibility for running the Chief Nurse position at HCCLC. In doing so she worked closely with Catherine Clark and Dr. Carol Rueter. The announcement

of the Chief Nurse position initially made on January 29, 2015. Plaintiff received the highest scores on both the interview and the interview and resume combined. Nevertheless, the selecting official, Doloresco, did not select her. She selected a lower scoring white applicant.

13.    Doloresco had a history of not allowing African-Americans and Asians in management positions. Ms. Doloresco had allowed only 5 African-Americans and 1 Asian to become managers or assistant managers out of 51 such positions in nursing as of January 2015. At that time these groups comprised 30% of the more than 1100 person nursing staff. The President of the Nurses Union, Dennis McLain brought these issues up to Doloresco and EEO manager Michael Benning in January 2015. Two of the African-Americans (USA) Plaintiff and Catherine Clark, were hired by Dr. Joseph, who came in to the HCCLC before Doloresco. Another was a manager in another area. The two other "African-Americans" are from the Caribbean Islands and therefore of different nationality. One was the selectee, who, like the Plaintiff, was a manager but in another area under Burcham. The other was her assistant nurse manager.   The Plaintiff is African-American (USA). The Plaintiff was not selected for the position three times. First, a lower scoring white was selected for the position. That selectee decided to go elsewhere. Therefore, the position was announced a second time. Plaintiff was again the highest and as discussed, recommended and endorsed by the panel, but she was not selected. On the third occasion a lower rated employee without plaintiff's HCCLC experience was selected. According to the selectee, she was told to take the position.

14.    Doloresco also discriminatorily demoted one of the three African-American nurse managers. Dr. Sherry Smith, an African-American nurse who was made a manager by a chief nurse  and the executive director before Doloresco came on board was discriminated against by  Doloresco in several ways such as being denied an assistant manager and office space when

all white managers had these. She was also forced to take problem employees. One of those problem employees then alleged that Smith engaged in improper conduct. This employee had made allegations like that in other places. None of them had been substantiated. She had multiple disciplines and was considered to not be credible. Nevertheless, in the fall of 2014 an AIB was formed to investigate Smith. The AIB correctly and totally ruled in favor of Smith and found this nurse and all her allegations to be unbelievable. Nevertheless, based on the allegations, in 2015, Doloresco had HR prepare a demotion of Smith and pushed her out of an area of nursing in which she had a doctorate degree. VanMeter assisted those efforts. At this same time VanMeter made a decision on discipline for a white manager who had two fact findings against him which found he bullied 8 people and assaulted a woman. VanMeter gave the white manager a disappearing reprimand while supporting Doloresco's demotion of a black manager on unfounded allegations.

15.    After the Plaintiff was not selected for the Chief of HCCLC in favor of a lower scoring white applicant the white applicant decided not to take the job. Instead of selecting the Plaintiff who was still the highest scoring applicant, consistent with Raia's statement, Doloresco began a second round of hiring. The Plaintiff and others that had applied in the first round were told that they need not apply, and that their scores would be considered in the second round. Nevertheless, the Plaintiff re-applied. She was not interviewed. Four additional interviews were conducted by the same panel members that had been involved in the initial interviews. Like the first panel, those panel members were Cary Burcham (Caucasian), Dr. Inna Sheyner (Caucasian American), Dr. Carol MacFarlane, (African-American), Assistant Chief of Social Workers, and Dr. Tom Engle, (Caucasian American) the Chief of Pharmacy.

16.    After the second round of interviews, Plaintiff was once again the highest scorer. The Plaintiff was not only well respected by all of those who worked with and under her, she was well respected by those who dealt with the HCCLC. For example, Dr. Sheyner was the Medical Director of HCCLC. She separately wrote that the Plaintiff was the top applicant in the first, second and third rounds. This document was sent to Doloresco and others but was not produced to EEO investigators. Plaintiff learned it was missing during depositions and obtained it. Carol MacFarlane was the Assistant Chief of Social Work, and worked closely with the Plaintiff in the HCCLC. She rated the Plaintiff as the number one applicant in rounds 1 and 2 by a significant margin. Similarly, Tom Engle had worked with the Plaintiff and his service (pharmacy) was involved in providing medications to patients in the HCCLC. He also rated Plaintiff higher than any other. After the second round, Dr. Sheyner sent a list of her considerations of all the applicants and the only one that she highly recommended was the Plaintiff.  She also pointed out that the Plaintiff , not Sanabria, had been carrying out the duties of the Acting Chief Nurse. MacFarlane, believed she also used forms that were similar to Dr. Sheyner's. After the second round, the only person who did not rate her the highest in the first round was a direct report of Doloresco, Cary Burcham (29). However, after the second round he endorsed her. Therefore, the Plaintiff had been recommended or endorsed by every member of the panel. She also had the support of the former longtime Chief Nurse of that area, Dr. Joseph.

17.    Indeed, before the second selection process, Raia, a Chief Nurse over another nursing service and a direct report, close friend and traveling companion of Doloresco had made statements overheard by Anthony Morella that Plaintiff was not going to get the position

because she was not "qualified". Given her experience, certification for the position and her receipt of the highest scores that could not be true in any appropriate way.

18.  Doloresco refused to select her again. Doloresco directed her administrative assistant, Jessica Ferraro, to undertake a third round. According to Ferraro, two of the panel members did not participate because they were frustrated with the process because it was taking too long to select someone. Carol MacFarlane said she could not participate because the third panel was set when she had a conflict.

19.  Ms. Ferraro maintained that at the time if one of the original panel members did not participate in either panel, they would use the average scores of all of those who did participate on either panel to determine the scoring of an applicant. In other words, they did not exclude people who did not interview everyone on every round.

20.  For the third go round, two people who did not report to Doloresco were off the panel: MacFarlane, the only African-American (USA born) on the panel and Engle. Their scores averaged together were 36. Doloresco had Zahira Sanabria (Hispanic Puerto Rico) placed on the panel. Sanabria reported directly to Doloresco.  She also had problems with the Plaintiff. She did not rate the Plaintiff, but gave the selectee a 35.

21.  According to the Agency during the Administrative stage the selectee, Cheryl Stephen Rameau was the highest scorer at 33.67. In the third round, Plaintiff was not interviewed. However, based on prior scores and Ms. Ferraro's testimony about how they scored with inconsistent panel members in 2015 she actually outscored Ms. Rameau because her average score was 34. Nevertheless, she was listed in the comparison as having only scored 33. While this was mathematically untrue, it did not matter because not only did the prior rounds show that Doloresco had something against the Plaintiff, Ms. Rameau had been told to apply

for or take the position.  Her resume was not even scored.  The Agency produced a document in discovery which showed all scored resumes after this issue came up in Ferraro's deposition in the Administrative stage.

22.    After Terrell was denied the position, the selectee ran out another of the African-American managers (born in the USA) Catherine Clark who went to another area as a staff nurse. She also drove out another African-American who was a non-manager education nurse, Sonji Banks.

23.     After the third round, Doloresco "selected" someone who Doloresco could argue was not a discriminatory hire, because she was black (albeit from the islands).

24.    Doloresco, Ferraro, Burcham and others have been involved in manipulating scoring panels to deny people promotions Doloresco did not want them to receive. McLain was not given 2 points he was qualified to receive which would have placed him above the selectee for interviews. Panel members including Burhcam expressed a desire to deny him an interview. Claudette Patricio an Asian American, had her panel process manipulated to deny her priority consideration she was entitled to receive. Dr. Smith was demoted despite having prevailed in the AIB.

25.    In her statement in the ROI, Doloresco maintained that she selected the person who was endorsed or recommended by the panel. She also claimed the interview panel indicated the Plaintiff did not possess comparable qualifications.  That statement is demonstrably untrue given the above. After the second round everyone recommended or endorsed the Plaintiff. After the third round, before which two panel members left due to frustration, or conflicts, or both, Dr. Sheyner went directly to Doloresco and told her that Plaintiff should be getting this job. Dr. Sheyner's recommendations were ignored as were the score of all panelists and even the

endorsement of Burcham in June 2015. The Plaintiff had better qualifications for this job. Both were experienced managers, but the Plaintiff's experience was with the HCCLC. She knew what was needed and had done it in an outstanding fashion. The Plaintiff had done the job for a year. She was also a veteran, a commissioned army officer who was recognized as the outstanding commissioned officer during officer training. The selectee was not. The selectee was not qualified and (Rameau) proceeded to run the service down. An important outside rating group lowered its score to a 1 out of 5 and the new Director removed her. However, the Plaintiff had left to go to another service. She knew Doloresco would not allow her back. Doloresco also had a history of retaliating against people who filed EEO or participated in other people's cases. Moreover, in her new position she reports to the medical Chief of Staff as well as the Ambulatory Services Chief Nurse.   She works off site and has little or no contact with Doloresco.

26.    Raia also expressed to the Plaintiff that she was concerned about the Plaintiff's use of Dr. Carol Rueter for running the HCCLC. Raia had maintained that she would never have hired Rueter if she knew that she was disabled. Rueter had a partially paralyzed leg. Rueter heard her say this and so did others.  In addition, Rueter had filed a grievance against Raia for using foul language openly at work and other matters. That grievance was decided in favor of Raia by Doloresco. After that Raia often pointedly made reference in front of Dr. Rueter that everyone knows she uses salty language. Raia also continually made reference to Dr. Rueter's disabilities with others suggesting she had problems with working hard because of it.

27.    Finally, the procedures followed in this case are directly contrary to the procedures which are applicable to the selection of managers in nursing as of August 2016. The Agency's alleged subject matter expert, Jessica Ferraro, admitted that these procedures are now the

procedures that nursing should be following. These procedures were adopted because of Doloresco's history of discrimination. Following a series of cases where African-Americans or Asians were not selected for managerial positions, EEO complaints were filed. There was a decision to have a committee investigate problems. They came up with the procedures which were not followed in this case.

## HOSTILE WORK ENVIRONMENT

28.    There was a hostile work environment which began in early 2015 and continued until after the selectee assumed and undertook her duties. The initial part of the hostile work environment involved the Plaintiff doing the duties of the Chief Nurse for the HCCLC prior to a final selection. Dr. Joseph had told Plaintiff that she would be performing the duties of the Chief Nurse and should use Catherine Clark, the manager and Dr. Carol Rueter to assist her. After that Doloresco made Sanabria the titular Chief Nurse. However, Sanabria did not perform any of the duties of the Chief Nurse. The Plaintiff did, and the HCCLC did not even get support from Sanabria at key moments including certifying board visits. Plaintiff was told she was the highest scorer on the first interview panel, but she did not get the position in favor of a white employee who did not take it. When the second set of interviews were going on, she was told by Raia that Doloresco and her did not like Dr. Rueter being involved in running the HCCLC, and became upset when Rueter found out. Raia also said in front of Anthony Morella that the Plaintiff was "unqualified". These sorts of public criticism are evidence of a hostility. In addition to the hostility expressed by Raia, another close confidant of Doloresco's, Dr. Sanabria, was hostile to the Plaintiff. Within two days after she was told that she was not selected for the position as Chief Nurse, Plaintiff was criticized by Dr. Sanabria for having moved Dr. Rueter into an office, something which happened before the selection. When the Plaintiff and the other

Nurse Manager and Dr. Rueter requested a meeting with Dr. Sanabria, they received one on September 25, 2015. Sanabria accused the Plaintiff and Dr. Rueter of having a close relationship. Plaintiff was then brought before Doloresco and given an email accusing her of behaving in an unprofessional fashion at the meeting on September 25, 2015. Dr. Rueter and Clark wrote reports contradicting this claim. The environment created by all of those is clearly hostile to the Plaintiff and tied directly to her failure to move up, and the terms and conditions of her employment.

29.    Following the selectee taking over the position, the selectee created a hostile work environment. As described by Catherine Clark, the selectee had a "damned if you do, damned if you don't" attitude to both Clark and Plaintiff.  She would find ways to criticize both of them in front of others.   The environment became so toxic that Clark left and took a staff nurse position in another place after having been in the HCCLC for several years and reaching a managerial level. Similarly, Dr. Carol Rueter who had been a nurse educator left the HCCLC and went out to Oklahoma. After having been held down repeatedly by Doloresco and Raia, Dr. Rueter is now acting as the head of all nursing as an Associate Director at the Oklahoma VA facility in Muskogee. In other words, she is performing the same position that Doloresco has in Tampa. Doloresco's, Raia's and Sanabria's attitude towards Rueter had nothing to do with Dr. Rueter's ability, but rather her disability and their animosity toward her. Similarly, it was their animosity based on discrimination and retaliation that created a hostile environment for the Plaintiff. Since Rameau has taken over, she has also questioned the Plaintiff's tour of duty, comp time earned, direct patient care hours, and other nursing activities as well as accusing her of being unprofessional and complained about her using her cell phone at meetings where she was using it to carry out her managerial duties in a professional way. The selectee also placed

13

the Plaintiff in a conflict of interest situation by requiring her to take action against an employee over the Plaintiff's objections and then issued a written counseling to the Plaintiff in March of 2015 for her involvement in that situation. The Selectee then excluded the Plaintiff from being involved in a number of leadership meetings and being a full participant in HCCLC leadership despite her managerial position.

30.   All of these are part of an environment that is designed to degrade and humiliate the Plaintiff to undermine her and impair her ability to do her job. It was not only obvious to the Plaintiff, but also to others.

## COUNT I
## RACE AND NATIONAL ORIGIN

31.   Plaintiff sues Defendant, Robert Wilkie, Secretary of the Department of Veterans Affairs for national origin and racial discrimination under Title VII.

32.   Plaintiff incorporates by reference and realleges paragraphs 1 through 30.

33.   As a direct and proximate result of the foregoing conduct, Plaintiff has been denied equal employment opportunity for wages, promotion and other terms and conditions of employment by the Defendant because of her national origin and race (African –American). Alternatively, these practices were motivated by a national origin and racially discriminatory animus.

34.   The above discriminatory actions were taken by supervisory personnel within the Haley VAHCS.

35.   The Defendant has intentionally maintained these discriminatory and unlawful practices to the detriment of Plaintiff.  The above-referenced actions have created an intolerable hostile work environment. Alternatively, these practices were motivated by a national origin and racially discriminatory animus.

36.    The Defendant at all relevant times knew, or should have known, of the above-referenced discrimination against Plaintiff.

37.    The Defendant has failed to take necessary action to prevent or correct the complaint of discrimination and in fact, ratified such conduct.

38.    The Defendant through Plaintiff's managers and supervisors has engaged in directed or ratified conduct and denied and frustrated Plaintiffs efforts to obtain relief under Title VII.

39.    The Defendant through acceptance of the complained of conduct, has fostered an attitude among supervisors at Haley VAHCS in Tampa that racial discrimination, national origin, and color discrimination are acceptable employment practices.

40.    Because of the willful actions of the Defendant and its administrators, managers and supervisors, and as a proximate cause thereof, Plaintiff has been and continues to be denied her rights to equal employment opportunity in violation of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*

41.    As a result of the foregoing, Plaintiff has been damaged. Those damages include, but are not limited to loss of pay; loss of benefits; loss of an amicable working environment; loss of career and professional opportunities; payment of attorneys' fees and legal costs; harm to her professional reputation; disruption of marital relations; expenses, including expenses relating to change of duties; humiliation, degradation, embarrassment, and severe emotional suffering and distress and aggravation of her medical conditions.  Plaintiff will continue in the future to suffer these damages absent relief from this Court.

WHEREFORE, Plaintiff requests prospective relief, judgment for damages, attorneys' fees and costs, and such other relief as this Court deems just and proper and for a trial by jury on all issues so triable.

**COUNT II**
**RETALIATION**

42.     Plaintiff, Tammie Terrell sues Robert Wilkie as Secretary of the Department of Veterans Affairs, for retaliation under Title VII.

43.     Plaintiff incorporates and re-alleges paragraphs 1 through 30.

44.     Plaintiff engaged in EEO activity which is protected under Title VII that included good faith opposition to unlawful discrimination as well as his participation in her own EEO case.

45.     The Defendant was aware of the Plaintiff's protected EEO activities.

46.     The Plaintiff was repeatedly denied promotions which would have included increases in pay and benefits and advancement.

47.     The aforesaid adverse employment actions, other adverse actions, misconduct, and other conduct, acts and omissions to the Plaintiff's detriment, were all taken (or failed to be taken) by administrators and managing and supervisory personnel with the Haley VAHCS in retaliation for the protected or EEO activity of the Plaintiff including those set forth above.  In the alternative they were motivated by his EEO activity.  They are the direct and proximate result of the EEO activity.

48.     The Defendant, through the supervisors of the Plaintiff, has engaged in, directed, and/or ratified retaliatory conduct, and has frustrated the Plaintiff's efforts to obtain relief and intentionally maintained these retaliatory and unlawful practices to the detriment of its employees.  The Defendant at all relevant times knew or should have known of the retaliatory

16

actions being taken against the Plaintiff and failed to take necessary action to prevent or correct the retaliatory actions being taken and, in fact, ratified such conduct.

49.    The Defendant, through acceptance of such conduct in this case and others, has fostered an attitude among administrators, managers and supervisors at the Haley VAHCS that retaliation against employees in order to discourage protected EEO activity is an acceptable employment practice.

50.    As a result of the foregoing, Plaintiff has been damaged. Those damages include, but are not limited to loss of pay; loss of benefits; loss of an amicable working environment; loss of career and professional opportunities; payment of attorneys' fees and legal costs; harm to her professional reputation; disruption of marital relations; expenses, including expenses relating to change of duties; humiliation, degradation, embarrassment, and severe emotional suffering and distress and aggravation of her medical conditions.  Plaintiff will continue in the future to suffer these damages absent relief from this Court.

51.    Plaintiff has satisfied all conditions precedent to the filing of this suit or has been prevented by the Defendant from satisfying such conditions or is excused under the law from satisfying any other conditions.

WHEREFORE, Plaintiff requests prospective relief, a judgment for damages, attorneys' fees and costs and such other and further relief as this Court deems just and proper and for a trial by jury on all issues so triable.

## Count III
## HOSTILE WORK ENVIRONMENT

52.    Plaintiff, Tammie Terrell sues Robert Wilkie, Secretary, Department of Veterans Affairs for harassment and hostile work environment under Title VII.

53.    Plaintiff incorporates and re-alleges paragraphs 1 through 30.

17

54.   As a direct and proximate result of the foregoing conduct, Plaintiff has been denied equal employment opportunity for wages, promotion, and other terms and conditions of employment by the Defendant due to harassment and hostile work environment.

55.   The above harassment and hostile work environment was engaged in by the supervisory personnel within the VA in order to harass the Plaintiff due to his EEO activity, or in the alternative was motivated by that activity. Given the long history of these actions and based upon all the conduct alleged above, the Defendant at all relevant times knew, or should have known, of the above- referenced harassment and hostile work environment against the Plaintiff.  The Defendant has failed to take necessary action to prevent or correct the harassment and hostile work environment and, in fact, ratified such conduct.  The Defendant, through the Plaintiff's managers and supervisors has engaged in, directed or ratified conduct, and denied and frustrated the Plaintiff's efforts to obtain relief.  The Defendant, through acceptance of the complained of conduct within the nursing department, has fostered an attitude among supervisors within the Haley VAHCS that harassment and hostile work environment are acceptable employment practices.  Because of the willful actions of the Defendant and its administrators, managers and supervisors, or in the alternative because of actions motivated by EEO animus, and as a proximate cause thereof, the Plaintiff has been and will continue to be denied his rights to equal employment opportunity in violation of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq.

56.   As a result of the foregoing, the Plaintiff has been damaged.  Those damages include, but are not limited to loss of pay; loss of benefits; loss of an amicable working environment; loss of career and professional opportunities; payment of attorneys' fees and legal costs; harm to her professional reputation; disruption of marital relations; expenses, including

expenses relating to change of duties; humiliation, degradation, embarrassment, and severe emotional suffering and distress and aggravation of her medical conditions.  Plaintiff will continue in the future to suffer these damages absent relief from this Court.

57.    Plaintiff has satisfied all conditions precedent to the filing of this suit or has been prevented by the Defendant from satisfying such conditions precedent, or is excused under the law from satisfying any other conditions.

WHEREFORE, Plaintiff requests prospective relief, judgment for damages, attorneys' fees and costs, and such other relief as this Court deems just and proper and for a trial by jury on all issues so triable.

**Count IV**
**INJUNCTIVE RELIEF**

58.    Plaintiff sues Defendant, Robert Wilkie, Secretary of the Department of Veterans Affairs for injunctive relief.

59.    Plaintiff incorporates and realleges paragraphs 1 through 30.

60.    Unless the above practices are enjoined, Plaintiff will suffer irreparable harm.

61.    There is: (1) a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless an injunction issues; (3) the threatened injury to Plaintiff is greater than any damage the proposed injunction may cause the opposing party; and (4) the injunction, if issued, will not disserve the public interest.

62.    Plaintiff requests the Court award her attorneys' fees and costs and enter preliminary and permanent injunctions enjoining the following practices, actions and conduct:

a.    Violating Title VII or the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.,* 42 U.S.C. 2000e-16 as described above including retaliation against Plaintiff for protected or EEO activity and discrimination based on race and disability, and

19

b.      Such other practices, actions or conduct, and in the manner, that the court deems

appropriate.

WHEREFORE, Plaintiff demands trial by jury of all issues so triable and such

other and further relief as the Court deems just and appropriate.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all issues so triable.

January 9, 2019

Respectfully submitted,

***/s/ Joseph D. Magri***
Joseph D. Magri
Florida Bar No.: 0814490
Merkle & Magri, P.A.
5601 Mariner Street, Suite 400
Tampa, FL 33609
Telephone: (813) 281-9000
Facsimile: (813) 2812223
Email: jmagri@merklemagri.com