# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

TAMMIE L. TERRELL,

      Plaintiff,

v.                           CASE NO. 8:20-cv-64-WFJ-AEP

DENIS MCDONOUGH, SECRETARY,
DEPARTMENT OF VETERANS AFFAIRS,[1]

      Defendant.

_____/

## ORDER

Before the Court is Defendant's Motion for Summary Judgment (Dkt. 31), the response (Dkt. 35), the reply (Dkt. 43), and the surreply (Dkt.51), together with all the declarations, depositions, and exhibits (Dkts. 31-1–31-7; 35-1–35-6; 39-1–39-2; 43-1; 51-1; 56-1; 63-1; 64-1).  After hearing argument of counsel, and after careful consideration and review of the submissions of the parties and the entire file, the Court grants summary judgment.

## INTRODUCTION

Plaintiff Tammie L. Terrell brings this Title VII[2] action against her present employer, the Veterans Administration ("VA"), alleging discrimination based on

---

[1] The successor officer is automatically substituted as a party.  *See* Fed. R. Civ. P. 25(d).

[2] "Title VII" refers to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*., which includes the specific sections stated in the complaint—42 U.S.C. § 2000e-16 and § 2000e-2(m). Dkt. 1 ¶ 1.

race and national origin (Count I), both participatory and oppositional retaliation (Count II), and harassment and hostile work environment (Count III).  She asserts her race and national origin are African American and her color is black.  Dkt. 1 at 3 and ¶ 33.  Ms. Terrell describes herself as "Black born in the U.S.A." and a "native born" African American.  Dkt. 35 at 3, 5l Dkt. 1 ¶¶ 13, 20.  The position she sought was filled by an African American born in Grenada: Cheryl Stephen-Rameau.  Ms. Terrell claims that the official who selects positions at the VA in Tampa (Laureen Doloresco –Caucasian) discriminates against African Americans born in the United States but not those born in the islands of the Caribbean Sea.  Dkt. 1 ¶¶ 13, 22, 23.

## FACTUAL RECORD

Ms. Terrell started working as a Staff Nurse at the James A. Haley VA hospital and medical center in 1998.  Dkt. 31-2 at 54 (Dep. of T. Terrell).[3]  She became an Assistant Nurse Manager in June 2010.  Dkt. 31-7 ¶ 3; Dkt. 31-2 at 51.  In May 2012, she became a Nurse Manager in the Haley Cove Community Living Center ("CLC") at the Tampa VA.  Dkt. 31-7 ¶ 3; Dkt. 31-2 at 57.[4]  In early 2015,

---

[3] Ms. Terrell is also a veteran and officer.  Dkt. 1 ¶ 3; Dkt. 35-3 at 308 (Decl. of T. Terrell).  Ms. Terrell avers that while she served in the military, she "supervised the medical support team at 53rd Field Hospital and supervised 20 people and interacted with all levels of the 200 person Field Hospital."  Dkt. 35-3 at 308.

[4] Ms. Terrell moved from the position of Assistant Nurse Manager in interventional radiology of the CLC to Nurse Manager in the CLC on May 7, 2012.  Dkt. 31-2 at 141 (Performance Appraisal).

she applied for Chief Nurse of the CLC but was not selected.[5]  Ms. Terrell continues to work at the Tampa VA as a Nurse Manager in a department other than the CLC.  Dkt. 31-7 ¶¶ 105, 106.

This lawsuit focuses on conduct, treatment, and interactions surrounding her 2015 application and non-selection for the position of Chief Nurse for the CLC.[6] Dr. Inez Joseph served as Chief Nurse of CLC until she retired in early January 2015.  Dkt. 31-2 at 61.  Ms. Terrell believed Dr. Joseph had groomed her for the job.  Dkt. 31-7 ¶ 4; Dkt. 31-2 at 61; Dkt. 31-2 at 216.  Laureen Doloresco, who has been the Chief Nurse Executive since 2010, would select Dr. Joseph's replacement as the Chief Nurse of CLC after the highest-ranking candidates underwent interviews before a selection panel.  Dkt. 31-7 ¶1; Dkt. 31-2 ¶ 1.

Ten of the over 70 applicants for Chief Nurse of CLC scored high enough to receive interviews.  Dkt. 31-7 ¶ 10; Dkt. 31-2 at 237–244, 264.  According to the chart compiled by Ms. Doloresco's assistant Jessica Ferraro, Ms. Terrell tied for the eighth highest resume score of 12 points.  Dkt. 31-7 ¶ 11; Dkt. 31-2 at 329. Ms. Ferraro, however, made scoring errors and Ms. Terrell's resume placed higher than eighth.  In any event, she received an interview.

---

[5] The CLC functions like a nursing home.  Dkt. 31-7 ¶ 3; Dkt. 31-2 at 192–93.
[6] There are approximately ten Chief Nurses of various departments at the Tampa VA, including Acute Care, Mental Health, and Spinal Cord Injury.  Dkt. 31-2 ¶¶ 2, 3, 4, 7.

The initial and second interview panel consisted of the same four people: Cary Burcham (Caucasian American born in U.S.), the Chief Nurse of Acute Care; Dr. Inna Sheyner (Caucasian American born in U.S.), the Medical Director of the CLC; Thomas Eingle (Caucasian American born in U.S.), the Chief of Pharmacy; and Carol MacFarlane (African American born in U.S.), the Assistant Chief of Social Work.  Dkt. 31-7 ¶ 12; Dkt. 31-2 at 238; Dkt. 35-3 at 310.  The interview panel conducted a performance-based interview and asked the same questions of each candidate in the same order.  Dkt. 31-7 ¶ 12; Dkt. 31-2 at 238–39.

Of the ten interviewees before the initial panel, Ms. Terrell received the highest combined score for the resumes and interviews.  Ms. Ferraro's error, however, showed the initial selectee Kathleen Miller's score as highest.  At Ms. Doloresco's request, Mr. Burcham prepared a comparison grid of the top interviewed candidates which included Ms. Terrell, Ms. Miller, and Ms. Rita Jordan.  Ms. Doloresco selected Ms. Miller.  Ms. Doloresco believed that Ms. Miller's over 20 years of experience in management and administration and her five years' experience as the Chief Nursing Officer at Florida Hospital Tampa made her a far superior choice to the other candidates.  Dkt. 31-7 ¶¶ 18, 19.

Before offering the position to Ms. Miller in February 2015, Ms. Doloresco met with Ms. Terrell.  She explained to Ms. Terrell that she needed more executive experience to compete for the Chief Nurse position.  Dkt. 31-7 ¶¶ 21, 22.  Ms.

4

Terrell admits she had a strong negative reaction to Ms. Doloresco's explanation. Dkt. 31-7 at ¶ 23; Dkt. 31-2 at 72.[7]

Ms. Miller, however, decided to accept a position elsewhere, leaving the CLC Chief Nurse position unfilled.  Dkt. 31-7 ¶¶ 25, 26; Dkt. 31-3 at 5.  Mr. Burcham then reached out to one of the remaining top four candidates, Ms. Rita Jordan, who had been a former interim Chief and Chief Nurse of a CLC.  Dkt. 31-7 ¶ 26.  Ms. Jordan had accepted a job in Arizona.  *Id.*

The job was posted a second time.  Of the 50 new applicants, three were interviewed in June 2015.  Dkt. 31-7 ¶¶ 27, 29, 31.  After Ms. Doloresco and Mr. Burcham discussed whether Ms. Terrell should be selected, and both having reservations, the position was posted a third time for internal applicants only.  Dkt. 31-7 ¶¶ 31–32 (Per Mr. Burcham, "I can only endorse Ms. Terrell, but with the reservations" we discussed).

Before the third round of interviews, Ms. McFarlane and Mr. Eingle wanted off the selection panel due to calendar conflicts, and Ms. Doloresco excused them after consultation with the Chief of HR.  Dkt. 31-7 ¶¶ 24, 35, 38.  The HR department required the interview questions to remain the same and permitted the averaging of all interview scores, as opposed to eliminating prior scores from the

---

[7] Ms. Terrell admits that she thought Ms. Doloresco's reason for her non-selection of lack of experience was "a bunch of crap" based on her experience under Dr. Joseph in the CLC.  Dkt. 31-2 at 72.

earlier panel.  Dkt. 31-7 ¶¶ 24, 35, 38.  Candidates previously interviewed would keep their prior scores.  The third interview selection panel included Dr. Zahira Sanabria (Hispanic).  Dkt. 35-3 at 310.  Dr. Sanabria was serving as the Chief Nurse of SCI (Spinal Cord Injury) in late 2014.  At Ms. Doloresco's request, Dr. Sanabria agreed to also serve as Acting Chief Nurse of CLC during the 2015 selection process.  Dkt. 31-7 ¶ 51; Dkt. 31-4 at 88–89.

After the revised panel conducted a few more interviews, the top overall candidates, in order, emerged as Ms. Stephen-Rameau, Ms. Terrell, and Mr. Hermes Vargas (non-African American).  Dkt. 31-7 ¶ 42.  Even assuming error in the score, the panel reached "unanimous agreement on recommending Cheryl Stephen-Rameau for CLC Chief Nurse."  Dkt. 31-7 ¶ 42.  Apparently, Mr. Burcham had reservations about recommending Ms. Terrell, but the record does not reveal the substance of his concerns.  Ms. Doloresco held doubts based on Ms. Terrell's strong reaction to her initial non-selection, her lack of executive and management experience, and the issues and conflicts that had arisen between Dr. Sanabria as Acting Chief Nurse of CLC and Ms. Terrell since early January 2015.  Dkt. 31-7 ¶ 32.  The record substantiates that Dr. Sanabria, as Acting Chief Nurse of CLC, encountered communication and supervisory issues with Ms. Terrell concerning their respective responsibilities in the CLC.  Dkt. 31-7 ¶

Before extending an offer, Ms. Doloresco again reviewed the resumes of the top three contenders.  In August 2015, she offered the position to Ms. Stephen-Rameau, who is an African American born in Grenada.  Ms. Stephen-Rameau worked 14 years as a Nurse Manager compared to Ms. Terrell's three years.  Ms. Stephen-Rameau, however, lacked experience in long-term care.  Ms. Doloresco thought the decision was a close call.  Dkt. 31-7 ¶ 44.

Additional facts regarding discrimination and the specific acts of alleged retaliation and harassment or retaliatory hostile work environment will be addressed under the relevant sections below.  Both Ms. Terrell and Ms. Stephen-Rameau continue to work at the Tampa VA.  In April 2018, Ms. Stephen-Rameau became Assistant Chief Nurse of Ambulatory Care.  Dkt. 31-7 ¶ 105.  At that time, Chief Nurse of Mental Health Raina Rochon (African American) transferred to become the Chief Nurse of CLC.  Dkt. 31-7 ¶ 105.  Since April 2019, Ms. Terrell has served as Nurse Manager in Whole Health and has reported to Ms. Stephen-Rameau.  Dkt. 31-7 ¶ 106.

## LEGAL STANDARD

The movant must show "there is no genuine dispute as to any material fact" and "the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A disputed fact is genuine if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 249 (1986).  When deciding whether a reasonable jury could return a verdict, the Court must view the evidence in the light most favorable to the non-moving party and must draw all reasonable inferences in that party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## DISCUSSION

Defendant argues summary judgment should be granted because there is no evidence that any differential treatment, retaliation, or harassment was based on the protected characteristics of either race and national origin or any EEO activity. Each of the three Title VII claims will be discussed in turn.

### *Title VII Discrimination*

In a Title VII action brought against a federal employer, personnel actions "shall be free from any discrimination based on" race, color, or national origin.  42 U.S.C. § 2000e-16(a).  Earlier this year following *Babb v. Wilkie*, 140 S. Ct. 1168 (2020), the Eleventh Circuit rejected application of the *McDonnell Douglas*[8] framework in determining causation for circumstantial evidence cases of discrimination such as this failure to promote case.  *Babb v. Sec'y Dep't of Veterans Affairs*, 992 F.3d 1193, 1204–05 (11th Cir. 2021) (applying on remand clarified causation standard in federal government age discrimination action).[9]

---

[8] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).
[9] *See Babb v. Wilkie*, 140 S. Ct. 1168, 1176 (2020) (articulating higher standard for but-for causation— "the object of that causation is 'discrimination,' i.e., differential treatment, not the

Nor does the convincing-mosaic test apply in actions brought against the VA. *Durr v. Sec'y, Dep't of Veterans Affairs*, 843 F. App'x 246, 247 (11th Cir. 2021) (holding that both the but-for method under *McDonnell Douglas* framework and the convincing-mosaic test are directed to the ultimate adverse employment *decision* rather than the but-for cause of the differential *treatment*) (citations omitted).  Although these two standards are no longer appropriate to apply in federal-sector cases, "a plaintiff must still show that a protected characteristic was the 'but-for' cause of differential treatment."  *Durr*, 843 F. App'x at 5.  The applicable inquiry in this post-*Babb* case is whether Plaintiff has shown that the protected characteristic—race or national origin—was the but-for cause of differential *treatment* in the decisional process, in addition to the *ultimate decision* not to promote.

<u>Racial Discrimination</u>

The Court will first address the but-for causation standard regarding the final decision.  Ms. Terrell and Ms. Stephen-Rameau are members of the same race—African American.  Ms. Doloresco ultimately selected Ms. Stephen-Rameau for the position of Chief Nurse of CLC.  Ms. Terrell does not contend that Caucasian or

---

personnel action itself").  "If age discrimination plays any part in the way a decision is made, then the decision is not made in a way that is untainted by such discrimination.")  *Id*. at 1174.

Hispanic colleagues with similar experience to hers were treated better.[10]  She

contends that a member of her same race was treated better.  Ms. Terrell does not

dispute these facts.  Any claim based on color or racial discrimination in the

ultimate decision must fail because the protected characteristic of race was not, and

could not have been, the but-for cause of the final adverse outcome.[11]

The Court next focuses on any differential treatment leading up to the

ultimate decision.  The first selectee, Ms. Miller, is Caucasian.  Dkt. 35-1 ¶ 113.

Ms. Miller ostensibly received the highest combined resume and interview score,

but Ms. Ferraro had incorrectly inputted the scores on the spreadsheet reviewed by

the selection panel.  Dkt. 63-1.  With an error-free scoring, Ms. Terrell would have

received the highest score of 34, instead of the 33 shown.  *Id.*  The result of the

incorrect scoring constitutes differential treatment on these facts.

Apart from the scores, Ms. Miller possessed 20 years' experience in

management and administration.  Five of those years she served as the Director of

---

[10] To the extent Dr. Sanabria (Hispanic) as Acting Chief Nurse of CLC could be compared to Ms. Terrell, Dr. Sanabria's selection cannot be attributed to Ms. Doloresco and is therefore not relevant.  Moreover, Dr. Sanabria already held a Chief Nurse position in SCI.  Although Ms. Terrell asserts that she ran the CLC as a *de facto* Acting Chief Nurse, Dr. Sanabria was the appointed Acting Chief Nurse and the two discussed each other's roles and duties throughout the relevant period. Dkt. 1 ¶ 7.

[11] *See*, *e.g.*, *Howard v. Roadway Exp., Inc*., 726 F.2d 1529, 1534–35 (11th Cir. 1984) (holding *prima facie* case requires showing that plaintiff was replaced by person not in protected class of race, but facts did not show that person who filled the position was of same race due to passage of time and other factors); *Cooper v. Ga. Dep't of Transp*., No. 1:16-cv-234, 2019 WL 11076203, at *11 (M.D. Ga. Sept. 20, 2019) (finding first prong of failure to promote claim not established because position was filled unequivocally by person in same protected class, distinguishing *Howard* on its facts).

Nursing at Florida Hospital.  Ms. Terrell held a nurse manager position at the VA beginning in 2012 but never served in an administrative capacity, except for her experience in the army supervising 20 people of the medical support team at a Field Hospital.  Dkt. 35-1 ¶ 107.  Ms. Terrell never held a position overseeing all nurses and staff such as a Chief Nurse position at the VA or a Director of Nursing position at another hospital.  Dkt. 31-7 ¶¶ 18, 19.  Although Ms. Miller did not have experience in the specific clinical area of long-term care, Ms. Doloresco valued more highly a lengthy track record of management, administrative, and executive experience.  Ms. Terrell cannot cite to any evidence to rebut the difference in experience between the two candidates.  Nothing in the record shows that but for Ms. Terrell's race, she would have been selected after the first set of interviews.

When Ms. Miller decided to leave for another position, Mr. Burcham asked another top-four candidate, Rita Jordan, if she would be interested in the position.  Ms. Jordan, however, had taken a position elsewhere.  Although it is believed that Ms. Jordan is African American, there is no record evidence of her race as the VA does not maintain this information.  Ms. Terrell has failed to show differential treatment without a showing that Ms. Jordan was not of the same race.

After the reposting of the position, no one was selected.  Consequently, Ms. Terrell did not suffer differential treatment resulting from the reposting.

11

Ms. Terrell also claims differential treatment resulted from the loss of the two panel members who ranked her the highest; Ms. MacFarlane and Dr. Sheyner ranked her higher than the other candidates after the first two postings.  She asserts the addition of Dr. Sanabria created a tainted panel because both Mr. Burcham and Dr. Sanabria reported to Ms. Doloresco, Mr. Burcham did not give her the highest score in the first two rounds, and Dr. Sanabria as Acting Chief Nurse of CLC voiced her disagreements and disappointment with Ms. Terrell about the day-to-day running of the CLC.  To the extent Ms. Terrell contends Ms. Doloresco's repostings constitute an aberration from agency protocol, the record shows similar processes were employed in two other clinical areas—Chief Nurse of Mental Health and Chief Nurse of Acute Care.  Dkt. 31-7 ¶ 39.  In any event, none of the issues raised concerning the selection process in this case invoke the protected characteristic of race or show that racial discrimination tainted the selection process.

The record shows Ms. Doloresco was in the habit of promoting candidates with more executive and administrative experience as opposed to experience in a special clinic.  Ms. Doloresco selected Chief Nurse of Mental Health, Raina Rochon (U.S. born African American) as well as MaryAlice Rippman as SCI Chief Nurse, both of whom had more executive experience than Ms. Terrell.  Dkt. 43-1 at 5–10, 21–13; Dkt. 31-7 ¶ 8.

Ms. Terrell attempts to rely on rudimentary statistics based on four or five individuals to show that Ms. Doloresco did not promote nurses who are African American. In the CLC, Catherine Clark (U.S.-born African American) worked as Assistant Nurse Manager alongside Ms. Terrell. Dkt. 35-3 at 310. The VA promoted Ms. Clark to Nurse Manager. Dkt. 31-2 at 177–79. Another nurse served as a manager in a different area, and two nurses worked as Assistant Nurse Manager and Nurse Manager in a third area under Mr. Burcham. Dkt. 35-1 ¶ 111. The latter two nurses are Americans born in the Caribbean Islands. Jerrell Showers (U.S.-born African American) was promoted to Assistant Nurse Manager during this time. Dkt. 35-6 at 127–29. This information tends to substantiate, rather than disprove, that African Americans were promoted in general, albeit none were comparators for the Chief Nurse position.

Looking at the possible comparators, Ms. Stephen-Rameau was promoted to the Chief Nurse of CLC. Raina Rochon (African American) was promoted to Chief Nurse of SCI. Dkt. 43-1 at 5–10. Ms. Rochon replaced Ms. Stephen-Rameau as Chief Nurse of CLC when Ms. Stephen-Rameau moved to another position at the Tampa VA. In sum, Ms. Terrell has failed to show a *prima facie* case of racial discrimination—that race played any part in the way the decisions were made.

13

## *National Origin Discrimination*

Ms. Terrell and Ms. Stephen-Rameau do not share the same national origin. *See Espinoza v. Farah Mfg. Co*., 414 U.S. 86, 88 (1973) (defining a person's "national origin" as the country where such person was born or from which that person's ancestors came).  Ms. Terrell was born in the United States; Ms. Stephen-Rameau was born in Grenada.  Ms. Terrell, a member of all U.S.-born persons, claims "reverse discrimination" in that she is part of the majority group.  *See Smith v. Fla. Gulf Coast Univ. Bd. of Trs*., No. 2:14-cv-50-FtM-29DNF, 2014 WL 7337415, at *4 (M.D. Fla. Dec. 23, 2014) (characterizing national origin discrimination claim as "reverse discrimination" where U.S.-born African American plaintiff alleged preferential treatment given to French-born Caucasian professor).

Ms. Doloresco, a U.S.-born American herself, failed to select another U.S.-born American.  The record shows that two Caribbean-born African Americans worked in another clinic at the VA as Assistant Nurse Manager and Nurse Manager and both reported to Mr. Burcham.  Dkt. 35-1 ¶ 111.  These individuals did not apply for the Chief Nurse of the CLC.

Ms. Terrell suffered no differential treatment in the selection of Ms. Miller because Ms. Miller is a member of the same national origin—U.S.-born.  A non-U.S.-born candidate was not considered until the third and final posting targeting

14

internal employees.  Ms. Stephen-Rameau possessed board certification as a Nurse Executive and 14 years of experience as a Nurse Manager (Dkt. 31-7 ¶ 44), and even though Ms. Terrell had worked in the specific clinical area of long-term care in the CLC, Ms. Terrell was not more qualified than Ms. Stephen-Rameau.  She has not shown that her application was treated differently based on her national origin.  *See Malone v. U.S. Att'y Gen.*, 2021 WL 2134850, at *5 (11th Cir. May 26, 2021) (affirming summary judgment for federal employer because there was no showing that decision was tainted by race discrimination or that his application was treated differently based on race where the selected candidate was not better qualified for job but had more experience).  Ms. Terrell fails to set forth a *prima facie* case of national origin discrimination—that national origin played any part in the agency's decisions.

### *Title VII Retaliation*

Retaliation must be considered because even though summary judgment should be entered for the VA on discrimination, "retaliation for complaining about prohibited forms of discrimination is itself 'discrimination' within the meaning of § 2000e-16(a)."  *Babb*, 992 F.3d 1193, 1204; *Durr*, 843 F. App'x at n.1 (citing *Babb*).[12]  A *prima facie* case of retaliation requires a plaintiff to establish she "(1)

---

[12] Although Title VII's private-sector anti-retaliation provision, § 2000e-3(a) is not incorporated by the federal-sector provision, "the federal-sector provision of Title VII does incorporate a

engaged in statutorily protected activity; (2) suffered an adverse employment action; and (3) established a causal link between the protected activity and the adverse action." *Malone,* 2021 WL 2134850, at *6 (citing *Bryant v. Jones*, 575 F.3d 1281, 1307–08 (11th Cir. 2009)).  A challenged retaliatory action is one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quotation omitted).[13]  Thus, the but-for causation standard no longer applies to Title VII federal-sector retaliation claims.  *Tonkyro v. Sec'y, Dep't of Veterans Affairs*, 995 F.3d 828, 833 (11th Cir. 2021).  Instead, the more lenient "well might have dissuaded" standard applies in determining causation. *Monaghan v. Worldpay US, Inc*., 955 F.3d 855, 861 (11th Cir. 2020).

Ms. Terrell alleges both opposition and participation claims of retaliation. Title VII forbids an employer from retaliation because the employee either "has opposed any practice made an unlawful employment practice" (opposition clause) or "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]" (participation clause).  42

---

remedial provision, 2000e-5(g)(2)(A), that authorizes relief for a violation of 2000e-3(a)." *Babb*, 992 F.3d at n. 5 (quoting *Gomez-Perez v. Potter*, 553 U.S. 474, 488 n.4 (2008)).

[13] "[M]istreatment based on retaliation for protected conduct—for example, making or supporting a charge of discrimination—is actionable whether or not the mistreatment rises to the level of a tangible employment action, but only if the mistreatment 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Monaghan v. Worldpay US, Inc*., 955 F.3d 855, 861 (11th Cir. 2020) (citation omitted).

U.S.C. § 2000e-3(a) (private sector anti-retaliation provision).  The Court finds

Ms. Terrell has shown no evidence of engaging in opposition activity before her

non-selection for Chief Nurse of CLC.  Her participation claim fails because Ms.

Doloresco, the decision-maker, and Mr. Burcham, a panel member, were unaware

that any EEOC claim had been filed at the time Ms. Stephen-Rameau was offered

the position on September 2, 2015.

The opposition claim hinges on Ms. Terrell's actions relative to Dr. Carol

Rueter, a disabled individual who started working in the CLC before Dr. Joseph

retired as Chief Nurse of CLC.  (Dr. Rueter applied for the Chief Nurse of CLC

position in 2015 but scored near the bottom of the first ten interviewees.)  Ms.

Terrell states that she and Ms. Clark sided with Dr. Rueter in believing Dr. Rueter

was discriminated against on the basis of her disability.  As alleged proof, Ms.

Doloresco brought up Dr. Rueter in the conversation she had with Ms. Terrell in

February 2015 when she explained the reasons why Ms. Miller had been selected

for Chief Nurse.  Ms. Terrell, however, cannot point to any comments made by

Ms. Doloresco to implicate her knowledge of any surmised discrimination against

Dr. Rueter.  Ms. Terrell states that Ms. Doloresco asked what Dr. Rueter's then-

current role was in the CLC, to which Ms. Terrell did not respond because she was

very hurt after not being selected for the promotion.  Dkt. 31-2 at 72.  Nothing in

the conversation mentioned or alluded to Dr. Rueter's disability; it consisted of one

17

simple question about Dr. Rueter's duties in the CLC, which Ms. Terrell did not answer.

The only other evidence cited in support of the Tampa VA's disability discrimination against Dr. Rueter concerns Dr. Lucille Raia.  In 2009, Dr. Rueter had worked for Dr. Raia, who was the Associate Chief of Nursing Education.  Dkt. 31-7 ¶ 62; Dkt. 31-2 at 214.  Dr. Rueter had filed a grievance against Dr. Raia based on her use of foul language.  *Id*. ¶ 63.  Dr. Rueter believed Dr. Raia was prejudiced against disabled people and testified that Dr. Raia told her she would not have been hired had Dr. Raia known she was disabled.  *Id*. ¶ 63.  Because Ms. Doloresco and Dr. Raia were friends, Ms. Terrell intimates they share the same prejudices.  Ms. Terrell asserts that Dr. Raia spoke with her in April 2015, before the decision regarding Chief Nurse of CLC, and told Ms. Terrell that she had "messed up" (ruined her chances of being selected), insinuating that Ms. Terrell was allowing Dr. Rueter to the run the CLC instead of herself.  Dkt. 31-7 ¶ 62.

Although Ms. Terrell claims she was not selected in retaliation for her support of Dr. Rueter, the record is unclear exactly how Dr. Rueter's alleged disability discrimination played any role in her non-selection.  Ms. Terrell never expressed any opposition to any alleged disability discrimination against Dr. Rueter.  Although Ms. Terrell claims she refused to take actions against Dr. Rueter to display her opposition to disability discrimination, she never identified what she

18

refused to do.  Additionally, the record is devoid of any evidence that Ms. Doloresco knew about Dr. Raia's April 2015 conversation with Ms. Terrell.  Dkt. 31-7 ¶ 64.[14]  Most tellingly, Dr. Rueter never filed an EEOC claim of disability discrimination.  Dr. Rueter eventually left the Tampa VA and took a Chief Nurse position in Oklahoma.

Ms. Doloresco never asked Ms. Terrell to do anything related to Dr. Rueter; Ms. Terrell never offered any information to Ms. Doloresco or anyone else regarding Dr. Rueter.  Dr. Sanabria as Acting Chief Nurse never asked Ms. Terrell to do anything related to Dr. Rueter until after her non-selection.[15]  Based on this record, a reasonable employee in Ms. Terrell's place would not have been deterred from filing a complaint with the EEOC.  *See Burlington Northern*, 548 U.S. at 69 (applying objective standard to what conduct "might well deter a reasonable employee from complaining about discrimination").  Ms. Terrell did not suffer retaliation for opposing disability discrimination against Dr. Rueter.

### *Title VII Hostile Work Environment*

----

[14] Likewise, there is no evidence that Acting Chief Nurse Dr. Sanabria directed Ms. Terrell to do anything relating to Dr. Rueter, save after the non-selection when Dr. Sanabria asked Ms. Terrell to physically move Dr. Rueter's belongings to another office.  Dkt. 31-7 ¶¶ 79, 81.

[15] Dr. Sanabria asked Ms. Terrell to move Dr. Rueter back into her original office.

Defendant argues that under either a substantive hostile work environment claim or a retaliatory hostile work environment claim, the evidence, or lack thereof, prevents Ms. Terrell's claims from proceeding to a jury.  The Court agrees.

Recent opinions articulate the different standards applied in Title VII substantive hostile work environment and retaliatory hostile work environment claims.  *Tonkyro*, 995 F.3d at 836–37 (citing *Monaghan*, 955 F.3d at 861).[16]  A substantive hostile work environment claim "still require[s] plaintiffs to show that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  *Id.* (quoting another source).[17]  Not only must the actions be sufficiently "severe or pervasive," they must be motivated by the plaintiff's protected characteristic or category.  *Id.* at 836.  The Supreme Court's *Babb* decision did not change the causation standard in federal employee substantive hostile work environment claims.  *Id.* at 836.

---

[16] The Eleventh Circuit first recognized a cause of action for retaliatory hostile work environment in *Gowski v. Peake*, 682 F.3d 1299 (11th Cir. 2012).  *Tonkyro*, 955 F.3d at 835 (citing *Gowski*, 682 F.3d at 1312).  *Monaghan* rejected *Gowski* to the extent it set forth a standard other than the "might well have dissuaded" for Title VII retaliation cases.  *Monaghan*, 955 F.3d at 861–62.

[17] The objective severity of the harassment must be evaluated by looking to the totality of circumstances including "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Tonkyro,* 955 F.3d. at 837 (quoting *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1276 (11th Cir. 2002)).

Courts must now employ a less stringent standard, however, in a retaliatory hostile work environment claim in a federal-sector case. *Tonkyro*, 995 F.3d at 833. The "well might have dissuaded" test replaces the "severe or pervasive" standard. *Id*. This Court must consider whether the conduct complained of by Ms. Terrell "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id*. at 836 (citing *Monaghan*, 955 F.3d at 862–63, quoting *Burlington Northern*, 548 U.S. at 68).

Ms. Terrell filed an EEOC claim in September 2015; Ms. Doloresco knew about the claim on September 24, 2015. Ms. Terrell claims Dr. Raia knew she opposed the disability discrimination against Dr. Rueter in the April 2015 conversation between them concerning how Ms. Terrell compromised her chances by allowing Dr. Rueter to "run" the CLC. Ms. Terrell contends Dr. Sanabria knew she opposed disability discrimination against Dr. Rueter because Dr. Sanabria asked Ms. Terrell to move Dr. Rueter's office. Ms. Terrell had assisted Dr. Rueter in moving her belongings to a new office, and Dr. Sanabria was concerned Ms. Terrell had succumbed to Dr. Rueter's influence. Ms. Terrell states that Dr. Rueter was relocated to accommodate three employees whose office had been flooded. These facts as allowed by Ms. Terrell do not show that either Ms. Doloresco or Dr. Sanabria knew that Ms. Terrell opposed Dr. Rueter's disability discrimination. Neither do they reveal any harassment based on race or national origin.

21

Ms. Terrell further asserts that both she and Dr. Rueter were treated

negatively by Ms. Stephen-Rameau after she joined the CLC. She lists 26

examples of negative treatment by various individuals beginning with the initial

selection of Ms. Miller and continuing well past Ms. Terrell's non-selection. Dkt.

35 at 15–16. For example, Ms. Terrell complains that she never received the credit

she was due for all her extra work in the CLC from the time Dr. Joseph retired to

the selection of Ms. Stephen-Rameau. She complains the additional duties

continued after selection because Ms. Stephen-Rameau was not up to speed in the

CLC. Quantity alone, however, does not determine retaliatory hostile work

environment. *See Baroudi v. Shinseki*, No. 8:14-cv-1099-T-30TBM, 2015 WL

6165496, at *2–3, 8-10 (M.D. Fla. Oct. 20, 2015) (finding that more than 80

incidents of alleged harassment, including downgraded performance evaluation

and temporarily blocked computer access, do not create *prima facie* case of

retaliatory hostile workplace).[18]

---

[18] The district court in *Baroudi* found that while the VA employee may have faced personal animosity at work, such treatment constitutes merely "ordinary tribulations" of the workplace, not actionable under Title VII. *Id.* at *9 (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 778 (1998)). Similar comparisons to the instant case include: Ms. Baroudi was excluded from one meeting (Ms. Terrell had to remain at the facility as most senior manager while Ms. Clark and Mr. Showers visited the Orlando VA CLC facility); Ms. Baroudi was reported for not responding to emails (Dr. Sanabria and Ms. Stephen-Rameau scolded Ms. Terrell for not responding to questions), Ms. Baroudi's performance was downgraded to "satisfactory" (Ms. Terrell received a written admonishment for refusing to meet with Ms. Stephen-Rameau in March 2016); Ms. Baroudi was required to meet with a particular employee who had criticized her work (Ms. Stephen-Rameau demanded Ms. Terrell conduct the official proficiency of Ms. Geibig over objection); and Ms. Baroudi was accused of being a "troublemaker" (Ms. Terrell was told in front of others that Dr. Raia said she was unqualified for the Chief Nurse position,

One incident spotlighted by Ms. Terrell involves a nurse, Sonia Geibig.  Dkt. 35 at 16.  Dr. Sanabria initially asked Ms. Terrell to conduct fact-finding (a type of pre-disciplinary investigation) on Ms. Geibig.  Dkt. 31-7 ¶75.  After Ms. Geibig complained to Dr. Sanabria about Ms. Terrell and Dr. Rueter, Dr. Sanabria reassigned the fact-finding task to another employee.  Ms. Terrell admitted this reassignment was a form of managerial support for her.  Dkt. 31-7 ¶ 75.  Ms. Geibig, nevertheless, filed an EEOC complaint against Ms. Terrell in October 2015 for bullying.  In March 2016, Ms. Stephen-Rameau demanded Ms. Terrell conduct the annual proficiency on Ms. Geibig, but Ms. Terrell refused to do so.  Dkt. 31-7 ¶ 93.  Ms. Doloresco stepped in to relieve Ms. Terrell of those duties.  *Id.*

These facts, when viewed in the light most favorable to Ms. Terrell, do not support a retaliatory hostile work environment claim and therefore may not proceed to a jury.  Ms. Terrell fails to link her extra workload in the CLC after Dr. Joseph retired, her non-selection for Chief Nurse of CLC, her conflict with Dr. Sanabria over moving Dr. Rueter's office, or her conflicts with Ms. Stephen-Rameau as CLC Chief Nurse to her race, national origin, or EEO activity.  A reasonable employee in Ms. Terrell's position would not have been dissuaded from

---

Dr. Sanabria called Ms. Terrell unprofessional in an email, and Ms. Terrell was "demeaned and belittled" in front of others at a meeting held September 15, 2015).  *Id.* at *2–3.  The Court recognizes the then-applicable but-for standard was applied to causation in *Baroudi*; however, these comparisons focus on the type of conduct that constitutes retaliatory harassment in the first instance.  In any event, a reasonable worker would not have been dissuaded from filing an EEOC complaint under the circumstances.

filing a complaint with the EEOC.  Ms. Terrell fails to establish a *prima facie* case of substantive or retaliatory hostile work environment.

Accordingly, Defendant's motion for summary judgment (Dkt. 31) is granted.  The Clerk is directed to enter judgment in favor of Defendant, terminate all pending deadlines, and close the case.

**DONE AND ORDERED** at Tampa, Florida, on October 1, 2021.

**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**

**COPIES FURNISHED TO:**
Counsel of record